**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES R. SKRZYPEK, and | ) | |
| JANICE M. SKRZYPEK, | ) | |
| | ) | No. 07 C 5753 & 07 C 5754 |
| Petitioners, | ) | No. 97 CR 516 |
| | ) | |
| v. | ) | Wayne R. Andersen |
| | ) | District Judge |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the amended petitions of James and Janice Skrzypek (the "Skrzypeks"), as prisoners in federal custody, for a writ of habeas corpus to correct their sentences pursuant to 28 U.S.C. § 2255. Before this court are also several motions relating to the appointment of counsel, production of files and documents, and other topics. For the reasons set forth below, the petitions are denied, and the remaining motions are ruled on as explained in this opinion.

## BACKGROUND

### I.      Factual Background

The Skrzypeks operated various security guard companies during the 1990s and committed numerous offenses using these companies and their employees. Through Federal Security, Inc., one of the companies, the Skrzypeks defrauded the Chicago Housing Authority ("CHA") of at least $1.1 million through false billings with inflated guard hours. (Government's Resp. to Defs.' Pet. at 11.) As the government explained, "James Skrzypek first obtained a contract by falsely telling the CHA that Federal Security had fifty guards when it had none," and

"virtually every employee of Federal Security was involved in some way, wittingly or unwittingly, in furthering the creation of time sheets which falsely represented that Federal Security guards were present at CHA residences." (*Id*. at 12, 13.) Furthermore, the Skrzypeks "also authorized the use of Federal Security funds to pay bribes to CHA employees responsible for overseeing Federal Security's performance in return for promises that the CHA would reduce oversight of Federal Security, award Federal Security additional contracts and pay Federal Security's fraudulent bills." (*Id*. at 15.) Meanwhile, as the Skrzypeks overstated the size of their workforce to the CHA, they understated the size of their workforce to the providers of their liability and workers compensation insurance policies, in order to reduce the insurance premiums they were required to pay. (*Id*. at 15-16.) "The Skrzypeks also withheld taxes from the wages of their guards, and then diverted this and other funds of their companies for their own benefit," spending the money on such personal items as jewelry, a large home, luxury autos, and extravagant trips. (*Id*. at 16.)

After the investigation was underway, the Skrzypeks concealed 70 to 80 boxes of previously subpoenaed records, and they submitted affidavits to the grand jury which falsely represented that they had produced all subpoenaed records. (*Id*. at 17.) The manner in which these records were discovered is at the heart of the Skrzypeks' petitions, and must be explained in more detail.

On July 23, 1997, FBI agents executed a search and seizure warrant that had been issued by the Honorable Marvin E. Aspen. The warrant authorized the agents to search for and seize a 1993 Porsche 968 Cabriolet, which had been named in the indictment as forfeitable proceeds of the charged RICO violations, and which the agents believed to be located in the unattached two-car garage located behind the Skrzypeks' residence. (Government's Resp. to Defs.' Pet. at 17;

Mem. in Supp. of Am. Pet. at 1, Ex. 1.)  Special Agent John Diwik entered the garage and immediately observed the aforementioned Porsche.  (Mem. in Supp. of Am. Pet. Ex. 2.)  Agent Diwik then observed "pull-down stairs to climb up . . . in the attic of the garage that were down." (Mem. in Supp. of Am. Pet. at 4; Government's Resp. to Defs.' Pet. at 17 (both citing Tr. at 2001).)  He described his next steps as follows: "So all I did was go up about four steps and just stick my head up there to see what was there or if anyone was there."  (Mem. in Supp. of Am. Pet. at 4; Government's Resp. to Defs.' Pet. at 17 (both citing Tr. at 2001).)  Diwik then observed, in plain view, numerous boxes with labels such as "CHA Contract" and "Telephone Bills Federal."  (Mem. in Supp. of Am. Pet. at 4; Government's Resp. to Defs.' Pet. at 18.) Agent Diwik "recognized these records as evidence of financial crimes being investigated as similar boxes of records had been obtained by the execution of prior search warrants." (Government's Resp. to Defs.' Pet. at 18.)  He did not proceed all the way up the staircase or move or open the boxes.  (*Id*.)  Instead, Diwik relayed the information to other agents, who then obtained another search warrant to search the garage, this time for the records in the garage attic. (Mem. in Supp. of Am. Pet. at 4; Government's Resp. to Defs.' Pet. at 18.)

The government asserts that Agent Diwik's actions leading to the discovery of the boxes were part of a valid "protective sweep."  The Skrzypeks argue that Agent Diwik exceeded the scope of the search authorized by the original warrant, and therefore that the discovery of the boxes was the result of an illegal search.  These arguments will be discussed more fully below.

## II.     Procedural Background

### A.     Original Trial

The Skrzypeks were charged with racketeering, mail and wire fraud, false claims, bribery of public officials, money laundering, obstruction of justice, and other charges.  The criminal

case (97 CR 516) included a total of 10 defendants, consisting of 5 individuals and 5 business entities.  The Skrzypeks entered a plea of not guilty, and a jury trial was held in early 2002.  At the conclusion of the trial, the Skrzypeks were convicted of all but one money laundering charge, and they were each sentenced to a total of 90 months imprisonment and ordered to pay restitution in the amount of $3,488,391, payable immediately.

**B.**      **Direct Appeal**

The Skrzypeks filed timely notices of appeal on March 17, 2005.  They made one argument on appeal, contending that the district court erred by failing to impose a payment schedule for restitution.  *United States v. Skrzypek*, 219 Fed. Appx. 577, 579 (7th Cir. 2007).  The Seventh Circuit affirmed the convictions and sentences of both of the Skrzypeks, but remanded the cases for the limited purpose of allowing the district court to set a payment schedule for restitution.  *Id*.

On July 31, 2007, the Skrzypeks filed a petition for certiorari with the United States Supreme Court, which was denied on October 1, 2007.  (Mem. in Supp. of Original Pet. at 1.)

**C.**      **Original and Amended Habeas Petitions**

James and Janice Skrzypek both filed petitions for relief pursuant to 28 U.S.C. § 2255 on October 10, 2007, in cases 07 C 5753 (James) and 07 C 5754 (Janice).  The dockets of both cases have largely mirrored one another since that time, with both petitioners generally filing identical motions simultaneously.

In their petitions, the Skrzypeks challenge their convictions by making a claim of ineffective assistance of counsel.  The defense attorneys failed to present motions to suppress evidence – namely, the boxes discovered in the Skrzypeks' garage attic – which the Skrzypeks claim were obtained through an illegal search, in violation of the Fourth Amendment.  The

government filed responses to each petition on March 6, 2008. (Dkt. 11 in 5753, Dkt. 8 in 5754.)

The Skrzypeks later filed amended petitions on September 22, 2009. (Dkt. 69 in 5753, Dkt. 52

in 5754.) The amended petitions did not raise any new grounds on which the Skrzypeks

challenged their conviction, but simply expanded the arguments the Skrzypeks made in support

of their claims. (Am. Pet. at 4 ("Some [sic] claim presented by the instant motion, except that

the legal arguments have been expanded.").) It is unclear whether the Skrzypeks' amended

petitions and memoranda were intended to supplement or replace their original petitions and

memoranda. Therefore, we note that in analyzing this claim, the Court examined and considered

all documents submitted by the parties, and all arguments made therein.

The Skrzypeks also filed identical "Motion[s] for an Order Directing the United States to

Answer Amended 28 U.S.C. § Motion[s]." (Dkt. 71 in 5753, Dkt. 54 in 5754.) While the title of

these motions suggests that the Skrzypeks were demanding that the government file new

responses to the newly amended petitions, the actual text of these motions seems to suggest that

the Skrzypeks are requesting leave to file amended petitions. This Court granted the Skrzypeks

leave to amend/correct their petitions in open court on December 17, 2009 (Dkt. 85 in 5753, Dkt.

66 in 5754), so any pending request to amend would now be moot. Furthermore, during the open

court hearing on December 17, 2009, Assistant United States Attorney Brian Netols represented

to the Court that the government considered all motions to be fully briefed, presumably relying

on the government's responses to the *original* petitions as sufficient to respond to the *amended*

petitions, and he indicated that the government did not intend to submit any additional filings on

any motions pending at that time.

**D.      Requests for Counsel**

The Skrzypeks filed joint motions for appointment of counsel on April 23, 2008.  (Dkt. 17 in 5753, Dkt. 11 in 5754.)  The Honorable James Moran denied James Skrzypek's motion on June 25, 2008.  (Dkt. 19 in 5753.)  No formal ruling on Janice Skrzypek's motion appears on the docket of case 5754, though the motion is no longer listed as pending.  On July 7, 2008, the Skrzypeks filed notices of appeal regarding Judge Moran's order of June 25, 2008.  (Dkt. 21 in 5753, Dkt. 14 in 5754.)  On that same day, the Skrzypeks filed requests for appointment of appellate counsel.  (Dkt. 22 in 5753, Dkt. 13 in 5754.)  On July 18, 2008, Judge Moran denied the Skrzypeks' requests for appointment of appellate counsel and their requests for certificates of appealability.  (Dkt. 27 in 5753, Dkt. 18 in 5754.)  The appeals were dismissed on October 27, 2008, for lack of jurisdiction.  (Dkt. 51 & 52 in 5753, Dkt. 34-36 in 5754.)  The Seventh Circuit stated, "This appeal is premature because the appellant's case continues in the district court." (Dkt. 51 in 5753, Dkt. 36 in 5754.)

On July 31, 2008, the Skrzypeks filed in the district court motions for reconsideration of the denial of the appointment of counsel.  (Dkt. 32 in 5753, Dkt. 24 in 5754.)  The government filed responses on March 27, 2009 (Dkt. 56 in 5753, Dkt. 40 in 5754), and the Skrzypeks replied on June 23, 2009 (Dkt. 66 in 5753, Dkt. 49 in 5754).  These motions for reconsideration of the denial of appointment of counsel remain pending, and will be addressed in this opinion.

On June 23, 2009, the Skrzypeks filed motions for appointment of *named* counsel, stating that attorney Kent Gipson had "expressed his willingness for an appointment by this Court to represent [the Skrzypeks]."  (Dkt. 67 in 5753, Dkt. 50 in 5754.)  These motions remain pending as well, and will also be addressed in this opinion.

### E. Motions Regarding Production of Documents/Files

On May 5, 2009, the Skrzypeks filed "Motion[s] to Order Production of Documents Pursuant to Rule 6, of the Rules Governing § 2255 Proceedings for the United States District Court." (Dkt. 64 in 5753, Dkt. 47 in 5754.) On June 23, 2009, the Skrzypeks filed "Motion[s] to Compel Delivery of Complete Client Files from Former Appointed Appellate Counsel," which also served as their "Repl[ies] to Government's Response to [the] Motions for Reconsideration." (Dkt. 66 in 5753, Dkt. 49 in 5754.) On September 22, 2009, the Skrzypeks filed "Motion[s] to Expand the Record." (Dkt. 72 in 5753, Dkt. 53 in 5754.)

All of these motions relating to production of documents and files will be addressed in this opinion.

## DISCUSSION

### I. Request for Counsel

Pending before this Court are the Skrzypeks' motions for reconsideration of the denial of appointment of counsel and motions for appointment of named counsel.

### A. Motions for Reconsideration

As mentioned earlier, the Skrzypeks' requests for counsel at both the district court and the appellate court were denied, and their appeal on this issue was dismissed. The Skrzypeks filed motions for reconsideration of the appointment of counsel on July 31, 2008. To the extent that their motions ask this Court to reconsider the denial of *appellate* counsel, the motions are moot, as there is no pending appeal for which counsel could be appointed. To the extent that their motions ask this Court to reconsider the denial of counsel for proceedings at the *district* court level, we analyze the issue as follows.

We start with the premise that "[a] section 2255 proceeding is an independent civil suit for which there is no constitutional right to appointment of counsel," though the court may, in its discretion, appoint counsel for such proceedings. *Oliver v. United States*, 961 F.2d 1339, 1343 (7th Cir. 1992). Factors that a court may consider in its decision regarding whether to appoint counsel include: (1) the merit of the petitioners' claims, (2) the futility of further investigation, (3) petitioners' proven ability to articulate and present their claims, and (4) the straightforward nature of those claims. *Id.*

In considering all of these factors, we conclude that there is no need to appoint counsel for the Skrzypeks in this proceeding. We agree with the reasoning set forth by the Honorable James Moran in his Memorandum Opinion and Order of July 18, 2008, in which he stated,

> The Skrzypeks have demonstrated an ability to articulate their legal positions, even though their own counsel has branded many of them frivolous. The suppression claim is a relatively narrow issue. Even were defendants correct, we see little possibility of their overturning their convictions. The evidence supporting conviction was overwhelming and came from many sources other than stored records.

(Dkt. 28 in 5753.)

While the Skrzypeks argue that they need lawyers to navigate the legal complexities involved in these proceedings, we find that they are capable of representing themselves in this regard. The Skrzypeks also seem to suggest that they require counsel in order to collect documents that they seek from their previous attorneys. However, we decline to appoint a lawyer for the purpose of assisting with such administrative tasks. (For additional discussion of production of documents and records, see the discussion below regarding the pending motions on this subject.) The motions for reconsideration are denied.

**B.      Motions for Appointment of Named Counsel**

In their motions filed on June 23, 2009, the Skrzypeks inform the Court that "Attorney [Kent] Gipson expressed his willingness for an appointment by this Court to represent Defendants," and they ask the Court to appoint Mr. Gipson to "represent Defendants in their § 2255 Petition."  (Mot. for Appointment of Named Counsel at 3.)  If the Skrzypeks wish to hire independent counsel to represent them, they are entitled to do so.  However, for the reasons set forth in the previous section, this Court declines to appoint counsel to represent the Skrzypeks. The motions for appointment of named counsel are denied.

**II.      Habeas Petition**

**A.      Standard of Review Under 28 U.S.C. § 2255**

The federal habeas corpus statute, 28 U.S.C. § 2255, provides that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside, or correct the sentence.

The court should grant a hearing on the issues raised in the petition unless the respondent demonstrates conclusively that the petitioner is not entitled to any form of relief. 28 U.S.C. § 2255.  The court must grant a hearing if the habeas petition "alleges facts that, if proven, would entitle" the petitioner to relief.  *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994) (citing *Pittman v. Warden, Pontiac Correctional Ctr.*, 960 F.2d 688, 691 (7th Cir. 1992)).  The petitioner must make specific, detailed allegations in order to qualify for a hearing; conclusory statements are insufficient.  *See Daniels v. United States*, 54 F.3d 290, 293-94 (7th Cir. 1995). Petitions filed by *pro se* petitioners will be held to a more liberal standard than those filed by

attorneys. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). Even under this more liberal standard, however, no hearing is required if the record conclusively demonstrates that the petitioner is not entitled to any form of relief. *Daniels*, 54 F.3d at 293.

## B. Claim of Ineffectiveness of Counsel

The Skrzypeks claim that their defense attorneys were "ineffective for failing to seek suppression of evidence recovered during illegal search of garage attic." (Am. Pet. at 4.) Ineffective assistance of counsel claims are examined under the two-pronged test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). This general test focuses on "the legal profession's maintenance of standards" rather than a critique of counsel's performance. *Id*. at 688. The petitioner must meet both prongs of the *Strickland* test or the claim fails. *Id*. at 687. The two prongs are the performance prong, and the prejudice prong. We examine each in turn.

### 1. Defense Counsel's Performance

The first prong, the performance prong, examines whether counsel's defense meets the standard of "reasonably effective assistance." *Id*. To satisfy this prong, the petitioners must affirmatively demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. In making this determination, the court is to give a high level of deference to counsel, because it is all too easy in hindsight, after the petitioner has lost his case, to find that counsel's lack of success fell below the level of representation that counsel is required to provide. *Id*. at 689. The petitioner must provide clear evidence, in the form of specific acts or omissions, to overcome this presumption. *Id*. at 689-90. The court must view the facts that the petitioner presents from the perspective of counsel at the time of the conduct alleged to be inadequate. *Id*. at 689.

The Skrzypeks argue that their defense attorneys were unreasonable in failing to present motions to suppress evidence that was retrieved from the Skrzypeks' garage attic. Before we can evaluate whether that course of action was unreasonable, we must first examine the law surrounding this type of search and seizure, including "protective sweeps" and the doctrine of "plain view."

### a. Protective Sweeps

The main point of dispute is whether Agent Diwik's actions leading to the discovery of the boxes in the garage attic constituted a lawful "protective sweep." A protective sweep is a quick and limited search of a premises meant to protect the safety of a law enforcement officer, and it is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325 (1990). During the trial, Agent Diwik provided the following testimony regarding protective sweeps:

> As a matter of practice, when we are sent to – like when we go arrest someone or if we go to execute a search warrant, we do what's called a sweep. What we'll do is go in all the rooms of the house, for instance, to make sure no one is there.
>
> The primary reason you do that is you don't want to have someone sneak up on you when you're doing, you know, whatever we are going to do, look for records or look for drugs or look for whatever we're looking for.

(Mem. in Supp. of Am. Pet. at 4 (citing Tr. at 2001); *see also* Government's Resp. to Defs.' Pet. at 17.) The Supreme Court has explained that the Fourth Amendment permits protective sweeps if the searching officer has a "reasonable belief based on specific and articulable facts, which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 327.

The first issue to be addressed with respect to the protective sweep analysis is whether *Buie* authorizes protective sweeps solely in the context of executing *arrest* warrants. *See Buie*,

494 U.S. at 327 ("A 'protective sweep' is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others.") (emphasis added). The Skrzypeks take the position that that *Buie* permits protective sweeps only when officers are present to execute an *arrest* warrant, not a *search* warrant (Mem. in Supp. of Am. Pet. at 10-11), while the government argues that "[t]he principal of a protective sweep is not limited to arrests" (Government's Resp. to Defs.' Pet. at 8). There appears to be a split among the circuits on this particular issue.

Both the Skrzypeks and the government cite to the Fifth, Sixth and D.C. Circuits, all of which have approved of protective sweeps conducted outside of the context of an arrest. *See United States v. Gould*, 364 F.3d 578, 584 (5th Cir. 2004) ("[A]rrest is not always, or *per se*, an indispensable element of an in-home protective sweep, and [ ] although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances."); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001) ("We think that it follows logically that the principle enunciated in *Buie* with regard to officers making an arrest – that the police may conduct a limited protective sweep to ensure the safety of those officers – applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); *United States v. Patrick*, 959 F.2d 991, 996 (D.C. Cir. 1992) ("Once the police were lawfully on the premises, they were authorized to conduct a protective sweep based on their reasonable belief that one of its inhabitants was trafficking in narcotics.").

The Ninth and Tenth Circuits have taken a more limited approach to the concept of protective sweeps, though both circuits have revealed some inconsistency or doubt on the subject. In a 1993 opinion, the Ninth Circuit concluded that it was reasonable for officers to

conduct a protective sweep of a home to ensure officer safety, even though no one was yet under arrest. *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993). However, in 2000, the court found that officers were *not* entitled to conduct a protective sweep under *Buie*, specifically because no one was being arrested when the officers entered the apartment. *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000). The Tenth Circuit concluded in 2002 that *Buie* permitted protective sweeps only if incident to arrest. *United States v. Davis*, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002). In 2007, the court came to the same conclusion, explaining that it was bound by the precedent of *Davis*, but also implying some reluctance in maintaining this position, noting that "[o]ne member of this court has expressed doubts that *Buie* 'lay[s] down a flat, per se rule banning protective sweeps by law enforcement in every other context.'" *United States v. Freeman*, 479 F.3d 743, 750 (10th Cir. 2007) (quoting *United States v. Garza*, 125 Fed.Appx. 927, 933 (10th Cir. 2005) (Tymkovich, J., concurring)).

The Seventh Circuit discussed the reach of the *Buie* decision in *Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005). In that case, the Leafs made the argument that the search conducted by law enforcement was unjustified because the officers did not intend to make an arrest. *Id.* at 1087. The Seventh Circuit explained that "the Leafs' argument misapprehend[ed] the lineage of the protective sweep," and that "the underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling." *Id.* The court concluded that this rationale applied in the situation before it, because "officers entered in order to ascertain whether a burglary had occurred [and] they had substantial reason to believe their safety might have been at risk." *Id.* We realize that the incident that took place in the Skrzypeks' garage may not have involved the same level of urgency or perceived risk as the situation in *Leaf*, but the underlying rationale of *Leaf* still

applies: "[I]t [is] not necessary for the officers to have made an arrest in order for their search of the [premises] to be justified; the only question is whether the search was objectively reasonable." *Id.*

The Skrzypeks cite to *Horton v. California*, 496 U.S. 128 (1990) for the proposition that once the item named in the search warrant is found, the search must terminate. (Mem. in Supp. of Am. Pet. at 7-8.) But the Skrzypeks misinterpret that case. It is true that the agents would not have been entitled to continue searching the garage for other items once the named item (the Porsche) was found, but that does not mean that the agents' right to perform a protective sweep also disappears. Even though the Porsche was immediately discovered, the agents had not yet completed the seizure of the item, and they would need to remain in the area for some time after the Porsche initially came into view in order to execute the remainder of their responsibilities. The concern of ensuring officer safety does not disappear simply because an officer happens to observe the target item before he has had a chance to sweep the area and make sure it is secure. As explained in the preceding paragraph, the relevant inquiry is whether the sweep was reasonable.

The Skrzypeks make several arguments in their effort to show that the sweep was unreasonable. First, they point to the fact that the garage was locked when the agents arrived, and the only electronic garage door opener was in the Porsche itself, locked in the garage. (Mot. for Produc. of Docs. at 6-7, 13.) Therefore, they contend, the government must be taking the "preposterous" position that "the Skrzypeks had admitted an armed assassin into the building and then <u>locked him in</u>!" (Mot. for Produc. of Docs. at 7 (emphasis in original).) The Skrzypeks stress the absurdity of this position by stating that "[n]o one locks people in their garage," and, moreover, it would have been even less likely that someone would have been locked in there on

this particular day, because "It was hot out!" (Mot. for Produc. of Docs. at 7, 13.) Furthermore, they assert, in order to support the notion that any agent would believe that the Skrzypeks lock people in their garage, the government would have to "provide a 'historical' record from their surveillance that demonstrated that the Skrzypeks had engaged in exactly that bizarre behavior in the past – while the FBI was watching the property over the preceding months." (Mot. for Produc. of Docs. at 7-8.) The Skrzypeks' arguments are unpersuasive. The mere fact that the garage was locked upon the agents' arrival does not provide the agents with conclusive proof that no one would be inside. During the moments leading up to their entry into the garage, the agents may not have had the opportunity to think through every conceivable entry or exit pattern that may or may not result in the keys and/or electronic openers to be in their current positions. Moreover, there is no way the agents would have been aware that the sole electronic door opener was inside the garage itself. Additionally, the Skrzypeks place an unreasonable burden on the agents by implying that the agents could not suspect that anyone was present in the garage unless that exact scenario had been captured during previous surveillance. The law does not require that the officers' perception of risk be supported by a record of the exact same event having happened in an identical manner in the past.

The Skrzypeks also point to a government memorandum that stated the following: "By summer of 1996 we also learned from Annette Jones, the former manager for Jim and Janice, that the Skrzypeks kept records in the loft of their garage behind 7620 West Foster and that Jim, Janice and Emily all had been seen storing and accessing records in the loft . . . ." (Mot. for Produc. of Docs. at 12.) In highlighting this memorandum, the Skrzypeks seem to argue that since this memo indicated the presence of *records* in the garage loft, but not the presence of any *people* locked in the garage, the agents knew that there was no danger of anyone being in the

garage when they arrived.  (*Id*.)  In addition to the fact that such an argument would be logically flawed (the presence of records does not necessarily preclude the presence of people), approximately one year had passed since the government "learned" of the presence of the records in the garage, so it is possible that the contents of the garage may have changed during that time.

The Skrzypeks draw attention to the fact that their home "was in an upscale area of Chicago, and had not been the scene of violence or civil strife."  (Mem. in Supp. of Am. Pet. at 15.)  However, as the government emphasizes, the Skrzypeks' home was also right next door to one of their security guard businesses, suggesting that it would not be unreasonable for agents to anticipate the possibility of encountering armed guards.  (Government's Resp. to Defs.' Pet. at 3, 24.)

Attempting to undermine the argument that the agents had any actual fear of armed guards, the Skrzypeks state, "There is no evidence that Diwik heard any noises from the attic, nor is there any evidence that Diwik had his gun drawn as he conducted the 'sweep.'"  (Mem. in Supp. of Am. Pet. at 13.)  The Skrzypeks also discuss the fact that agents were in the Skrzypeks' home earlier that same day, taking Janice inside the home so she could obtain a ring, car keys, and her husband's medication, and no protective sweep was conducted inside the home at that time.  (*Id*. at 3, 15.)  All of these assertions may be true, and they are potentially relevant to evaluating the situation as a whole.  However, they are by no means conclusive.  The law does not say that a protective sweep is valid only if supported by audible warnings, only if conducted with weapons drawn, and/or only if performed in every instance of entry into any building in the area.

The Skrzypeks also point to a section of the trial transcript to undercut the idea that Agent Diwik was genuinely concerned about the presence of a potentially dangerous person.  The

following question and answer exchange took place between the Assistant United States Attorney and Agent Diwik:

> Q:  In any case, there was no evidence of any danger?
>
> A:  Exactly, I was there by myself in his garage.  I noticed in his garage that he had pull-down stairs to climb up to go up in the attic of the garage that were down.  So all I did was go up about four steps and just stick my head up there to see what was there or if anyone was there.

(Mem. in Supp. of Original Pet. at 3 (citing "Trial 2000-2001"); Mem. in Supp. of Am. Pet. at 4 (citing Tr.Transcript at 2001).)  Seemingly alluding to Agent Diwik's initial response of "exactly," the Skrzypeks claim that, "[b]y his own admission, Agent Diwik was in a completely non-threatening situation and pointed to no specific, articulable facts suggesting that the detached garage harbored anyone who posed a danger to him." (Mem. in Supp. of Original Pet. at 3.)  They also point to the fact that Diwik testified that he was looking for "what" might be there, not simply "who" might be there.  (Mem. in Supp. of Am. Pet. at 14.)  These arguments mischaracterize Agent Diwik's testimony.  First, the word "exactly" was followed with an explanation as to what Agent Diwik did to come to the conclusion that there was no danger.  Second, the phrase "to see what was there" was immediately followed by the phrase "or if anyone was there."  While testifying in court, witnesses do not have the benefit of scripting the precise words they will use to convey their thoughts, so the testimony must be viewed as a whole, in the context of the witness' entire answer, without undue weight given to a single word.  The fact that the word "what" was uttered does not eliminate the possibility that the agents may have expected to find a person.

The government argues plainly that the fact that the stairway was in the down position when the agent entered the garage, combined with the fact that one of the Skrzypeks' security guard businesses was next door, supports the rational inference that someone could have been in

the attic, and that person could have been armed.  (Government's Resp. to Defs.' Pet. at 24.)

Furthermore, the government asserts that the extent of the sweep "was just as *Buie* instructed it

should be, cursory, lasting only seconds, and no further than was necessary to dispel the

reasonable suspicion of danger."  (*Id.*)  "In fact," they contend, "Agent Diwik's sweep was

arguably not extensive enough, given that he did not walk all the way up the stairs and thus

would not have been able to see anyone hiding behind the boxes."  (*Id.*)

We agree with the government.  Agent Diwik's brief sweep of the garage attic was

"objectively reasonable," as required by *Leaf*, 400 F.3d at 1087, and it was based on a perceived

risk supported by "specific and articulable facts," as required by *Buie*, 494 U.S. at 327.  As

discussed above, we find the Skrzypeks' arguments attacking the validity of the protective sweep

unconvincing.  The staircase was in the down position, the agent knew there was a high

likelihood of armed guards in the vicinity, and the agents were going to need to remain in the

garage for some period of time to fully execute the seizure of the Porsche, focused on those

responsibilities and unable to remain watchful and alert for the unexpected presence of other

individuals.  The agent's decision to briefly scan the attic was reasonable.

### b.     Plain View

Pursuant to the plain view doctrine, "if (1) the officer is lawfully present, (2) an item not

named in the warrant is in the plain view of the officer, and (3) the incriminating nature of the

item is immediately apparent, the officer may seize the item without a warrant and the item need

not be suppressed at trial*." United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997) (citing

*Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)).  The parties do not dispute the law

surrounding the concept of "plain view," nor do they disagree about the fact that the

incriminating nature of the boxes in the garage attic was immediately apparent.  The Skrzypeks

simply take the position that the agent was not "lawfully present" in the attic when he observed the boxes. As discussed above, we concluded that the agent performed a valid protective sweep pursuant to *Buie*, and his presence in the attic was therefore lawful.

### c. Counsel's Strategy

As discussed earlier, to satisfy the "performance" prong of the *Strickland* test, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The relevant question is whether, based on the law surrounding "protective sweeps" and "plain view" that we examined above, the Skrzypeks' trial attorneys were unreasonable in failing to present motions to suppress the evidence retrieved from the garage attic.

The Skrzypeks state, bluntly, "In the instant case, there is no reasonable tactical basis for <u>not</u> filing a suppression motion." (Mem. in Supp. of Original Pet. at 5 (emphasis in original).) The government, on the other hand, argues, "[T]he record establishes that trial counsel exercised reasonable professional judgment in declining to pursue a legal strategy which was unsupported by the law." (Government's Resp. to Defs.' Pet. at 3.)

"When the claim of ineffective assistance is based on counsel's failure to present a motion to suppress, [the Seventh Circuit] [has] required that a defendant prove the motion was meritorious." *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005) (citing *Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004); *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004)). "If there was no underlying constitutional violation, a motion to suppress would have been futile and counsel could not be viewed as ineffective for failing to present such a motion." *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004) (citing *Strickland*, 466 U.S. at 686).

Based on the earlier analysis of the law involving protective sweeps, it would have been highly unlikely for any such suppression motion to have been successful.

However, even if there might have been a chance that the trial judge would have granted a suppression motion, this does not automatically mean that counsel's decision *not* to submit such a motion was unreasonable. Attorneys are entitled to exercise professional judgment in deciding which trial strategy they expect to be most effective. The government provided the following explanation of defense counsel's trial strategy surrounding the documents seized from the Skrzypeks' garage attic:

> The Skrzypeks' trial counsel did not seek to suppress the records recovered from the garage attic. Instead, trial counsel pursued the trial strategy of defending against the obstruction charges by attempting to establish "that the materials that were taken from the garage were really copies of what the government already had or had been made available to them." TR. 2046. Trial Counsel then proceeded through the cross examination of Agent Diwik to try to establish that the Skrzypeks' failure to produce the records recovered from the garage attack in response to the grand jury subpoenas did not obstruct the investigation because the equivalent of those documents were already in the possession of the government as a result of the prior searches or were duplicative of the records that the government obtained from the computers in the Skrzypeks' businesses. Tr.2048-65.

(Government's Resp. to Defs.' Pet. at 21-22.) In this case, it appeared as though the goal of the Skrzypeks' attorneys was to minimize the importance of the documents discovered in the garage attic, with the hope of weakening the government's claim that the Skrzypeks obstructed the investigation in any meaningful way. (Government's Resp. to Defs.' Pet. at 21-22 (citing Tr. 2046, 2048-65).) Defense counsel may have thought that a suppression motion would have been inconsistent with this approach.

Regardless of the strategy that counsel was trying to implement, "[i]t is not [the] court's role to play Monday-morning quarter-back concerning which was the better of two viable trial strategies. After all, it is 'all too easy for a court, examining counsel's defense after it has proved

unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" *Smith v. Gaetz*, 565 F.3d 346, 354 (7th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

In *Cieslowski*, the reasons the defendant's attorney gave for deciding not file a motion to suppress included the facts that "she did not believe [defendant] would prevail [on the motion]," and that "it would have made little difference considering the overwhelming evidence" against the defendant. *Cieslowski*, 410 F.3d at 360-61. The court concluded that such decisions "fall squarely within the realm of strategic choice and thus do not support a claim of ineffective assistance of counsel." *Id.* at 361. This rationale is applicable in the instant case as well. A motion to suppress the documents from the garage attic was unlikely to succeed, and the other evidence against the Skrzypeks was overwhelming. Therefore, regardless of the precise trial strategy that the Skrzypeks' attorneys were attempting to pursue, their decision not to file a suppression motion was reasonable.

To summarize, the Skrzypeks' attorneys were entitled to exercise professional judgment and make strategic decisions, and any motion to suppress most likely would have failed anyway. Petitioners must provide clear evidence to overcome the presumption that the representation their attorneys provided was reasonable, and the Skrzypeks' emphatic but unsupported assertion that there was "no reasonable tactical basis for <u>not</u> filing a suppression motion" (Mem. in Supp. of Original Pet. at 5 (emphasis in original)) is simply insufficient to overcome that presumption.

### 2. Prejudice

The second prong of the *Strickland* test, the prejudice prong, examines whether counsel's act or omission had an adverse effect on the defense. *Strickland*, 466 U.S. at 692. This prong protects against the situation when counsel may have acted unreasonably but the unreasonable act or omission did not prejudice the petitioner's defense. *Id.* at 691-92. To satisfy this prong,

the petitioner must affirmatively demonstrate the prejudice that resulted, and must further demonstrate that there is a "reasonable probability" that his attorney's acts or omissions affected the outcome. *Id*. at 693-94. The court should make this determination in light of the totality of the evidence. *Id*. at 695.

As stated above, we concluded that the Skrzypeks' attorneys acted reasonably in deciding not to file suppression motions. However, even if we assume that counsel's decision was unreasonable, that a suppression motion should have been filed, that such a motion would have been successful, and that all of the evidence discovered in the Skrzypeks' garage would have been suppressed, the end result would have been unchanged.

In arguing that the evidence was prejudicial, the Skrzypeks point to the following testimony by the lead case agent:

> Q: What would have been the impact on your ability to conduct the kind of analysis you did if you weren't able to get the records of that type and specifically some of the records that were up in the garage?

> A: You know, if we were trying to data-load payroll records, which if you look there, there are, it was nearly impossible to complete our task, because half of the evidence had been withheld from us.

(Mem. in Supp. of Original Pet. at 4-5.) Furthermore, the Skrzypeks cite to what appears to be a government memorandum explaining the charges of the indictment, in which the following statements were made: "Combined with additional grand jury work, the records obtained in the garage and Monarch searches, provide the evidence upon which we base the additional insurance fraud, money laundering, and tax charges against the Skrzypeks. The Skrzypeks concealment of these records is also the basis for an obstruction charge." (Mot. for Produc. of Docs. at Ex. 6G.) The government also referred to the boxes as "very inculpatory." (*Id*. at Ex. 6A.) Finally, the Skrzypeks object to the manner in which the records were presented, claiming that the government used this evidence to create a "show," as boxes were "paraded" in front of the jury,

"creating an impression of guilt," and jurors were permitted on two occasions to personally inspect the boxes.  (Mem. in Supp. of Am. Pet. at 16-17.)

In response, the government points to multiple reasons why no prejudice resulted from the admission of the records from the garage attic.  Significantly, the government claims that the evidence obtained from the garage was "wholly irrelevant" to the convictions for racketeering, bribery, insurance fraud, money laundering, and tax crimes, and the Skrzypeks "received concurrent sentences on various counts, with the result being that [the conviction for obstruction] resulted in no additional time."  (*Id*. at 2, 3, 26.)  Even with respect to the counts for which the records from the garage *were* relevant, the government makes the following assertion:

> The records from the Skrzypeks' garage were helpful in determining the *extent* to which a specific bill submitted to the CHA was false, and thus to the determination of a specific total loss number with respect to the fraud and false claims on the CHA.  They were not, however, necessary to determine that the bill was false and this was the basis for their convictions. . . . [T]here was more than enough evidence from the CHA's own records, Federal Security's computerized records and the testimony of the Skrzypeks' employees to support the jury's finding that every bill was false.

(Government's Resp. to Defs.' Pet. at 25-26 (emphasis added).)

Furthermore, looking past trial and to the sentencing phase, the government argues that "the loss amount for sentencing purposes is only required to be a reasonable estimate, not the level of precision that the FBI was trying to attain," and "even with out reference to the records from the garage, the total loss, which includes the losses of $2.3 million suffered by the insurance companies, still would have been well above the $2.5 million amount which was the loss thresh hold for the guideline section applied to determine their sentence."  (Government's Resp. to Defs.' Pet. at 26-27.)  In sum, the government contends that even if the records from the garage attic had not been admitted, the "avalanche" of other evidence against the Skrzypeks was

so "overwhelming" that the outcome would have been the same. (Government's Resp. to Defs.' Pet. at 3, 21, 25.)

Based on the foregoing, the Skrzypeks' sentences would have been the same whether the records from the garage attic had been admitted or not. It appears as though there was sufficient evidence to reach the same conviction and sentence for all counts. Even if the jury *had* decided to acquit on the charges for which the garage records were relevant, the convictions for racketeering, bribery, insurance fraud, money laundering, and tax crimes would have been the same, leaving the Skrzypeks' 90-month sentences unchanged. The records from the garage were not an essential part of the convictions and sentences, and we see no evidence that what the Skrzypeks describe as a "parade" or "show" of document boxes had any impact on the jury's ultimate decision. We find that no prejudice resulted from the trial attorneys' decision not to file motions to suppress.

## III.  Motions Regarding Production of Documents/Files

As mentioned earlier, the Skrzypeks have also filed motions regarding production of documents and/or files, each of which is addressed in the following sections.

### A.  Motion to Order Production of Documents

On May 5, 2009, the Skrzypeks filed "Motion[s] to Order Production of Documents Pursuant to Rule 6, of the Rules Governing § 2255 Proceedings for the United States District Court." (Dkt. 64 in 5753, Dkt. 47 in 5754.) In these motions, the Skrzypeks claim that there are documents and/or pages of documents which relate to searches of the Skrzypeks' home and garage, and that they are entitled to obtain these documents pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). However, "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rules Governing §2255 Cases, Rule 6(a). The Supreme Court has said that Rule 6 is meant to be "consistent" with *Harris v. Nelson*, 394 U.S. 286 (1969). *See Bracy*, 520 U.S. at 909 (citing Advisory Committee's Note on Habeas Corpus Rule 6, 28 U.S.C., p. 479). In *Harris*, the Court stated,

> [W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

*Harris*, 394 U.S. at 300. With these standards in mind, we look to whether the Skrzypeks have sufficiently demonstrated a need for discovery.

First, with respect to the search of the garage attic, the Skrzypeks contend that they need (1) "unexpurgated" versions of incident reports, and (2) missing pages of a certain government memorandum. Regarding the incident reports, the Skrzypeks seem to make the argument that simply because the names of agents were redacted from the reports, the reports must have been fabricated, which they could prove if they had the versions with the complete names. (Mot. for Produc. of Docs. at 10-11.) As for the missing pages of the particular government memorandum, the Skrzypeks claim that the "pages that *do* exist of these documents show a pattern of deliberate and intentional lying at the Skrzypeks' trial, as well as in procurement of the warrants justifying the search," and "[t]he Skrzypeks' due process rights dictate the need for production of these missing pages in order to make a determination as to what extent those rights were violated." (Mot. for Produc. of Docs. at 15 (emphasis added).)

Unsupported assertions that government documents contain "lies" and "fabrications" are not sufficient to show "good cause" for discovery, as required by Rule 6. These allegations of deceptive behavior are based solely on the fact that some names and/or pages are missing from those documents, and there is no evidence to suggest that obtaining the missing names/pages would allow the Skrzypeks to show that they are entitled to any relief. As discussed above, even if new documents revealed that the protective sweep of the garage attic was illegal, the Skrzypeks are not entitled to any relief because they did not suffer any prejudice.

In addition to documents relating to the search of the garage attic, the Skrzypeks also contend that there are documents relating to unauthorized searches of their home. The Skrzypeks state that, during trial, the government displayed and discussed interior photographs of the Skrzypeks' home and also used as an exhibit a document that the Skrzypeks assert could only have been obtained from inside their home. (Mot. for Produc. of Docs. at 4, 6, 18.) The Skrzypeks also claim that, while accessing and reviewing the government's files on June 27, 2004, they discovered evidence "showing warrantless searches immediately preceding the Skrzypeks' indictment in the form of a series of handwritten notes authored by Mr. Netols." (Mot. to Order Produc. of Docs. at 4-5.) Furthermore, they point to the fact that they sent a FOIA request to the FBI's Chicago field office on January 22, 2009, requesting documents relating to entries made into their home while they were jailed July 23-25, 1997, to which the FBI responded by indicating that the requested material was exempt from disclosure pursuant to 5 U.S.C. § 552. (Mot. for Produc. of Docs. at 2.) That statutory provision provides as follows: "This section does not apply to matters that are records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records

or information could reasonably be expected to interfere with enforcement proceedings." 5

U.S.C. §552(b)(7)(A). According to the Skrzypeks,

> [t]he FBI's invocation of [Title 5, U.S.C. 552] (b)(7)(A) in response to
> Petitioner's FOIA request for documents related to entries to the Skrzypek home
> by the FBI clearly establish that:
>
> | | |
> |---|---|
> | (1) | there were searches; |
> | (2) | there were no search warrants; |
> | (3) | there were no exigent circumstances; |
> | (4) | Petitioners had not consented to the searches; |
> | (5) | there was an unreasonable invasion of Petitioners' Constitutionally protected interest in privacy; |
> | (6) | documents relating to the searches exist. |

(Mot to Order Produc. of Docs. at 6.)

The allegations set forth in this motion do not "clearly establish" any of the conclusions

that the Skrzypeks include in their numbered list. Mere invocation of an exemption provided by

statute does not "clearly establish" any wrongdoing. The Skrzypeks ask this Court to order the

production of documents related to allegedly illegal searches, but there is no evidence that any

such searches occurred or that any such documents exist, let alone any evidence supporting the

inference that such documents would show that the Skrzypeks are entitled to relief.

In summary, nothing in the Skrzypeks' Motions for Productions of Documents leads us to

conclude that there is "good cause" to engage in discovery pursuant to Rule 6. Therefore, the

motions are denied.

### B. Motion to Compel Delivery of Complete Client Files

On June 23, 2009, the Skrzypeks filed "Motion[s] to Compel Delivery of Complete

Client Files from Former Appointed Appellate Counsel." (Dkt. 66 in 5753, Dkt. 49 in 5754.) In

their motions, the Skrzypeks ask the Court to order that former appellate counsel turn over the

attorneys' entire files with respect to the Skrzypeks.

This is not the first time that the Skrzypeks are seeking the Court's assistance in obtaining documents from their prior counsel. On November 27, 2007, the Skrzypeks filed "Motion[s] for Order[s] Directing Former Appellate Counsel to Transmit Clients' Complete File [ ]." (Dkt. 7 in 5753, Dkt. 6 in 5754.) On March 7, 2008, the Honorable James Moran issued an order containing the following instruction: "[W]e direct the attorneys on direct appeal and on remand to furnish to the defendants, within 14 days, copies of all public records in their possession relating to the seizure of records from defendants' residence in July 1997." (Dkt. 12 in 5753.) Unsatisfied with the documents produced as a result of the Court's March 7, 2008 order, the Skrzypeks now renew their request for complete client files.

Are the Skrzypeks entitled to such files? In 2006, the Seventh Circuit was presented with a situation in which a law firm argued that work product was the "exclusive property" of the firm, with the former client having no entitlement to the work product for any purpose. *Hobley v. Burge*, 433 F.3d 946, 950 n.3 (7th Cir. 2006). In the footnote addressing this point, the Seventh Circuit highlighted the fact that opinions from the Illinois State Bar Association and certain district courts supported the law firm's argument that the files belong to the attorney, whereas other courts and the Restatement (Third) of the Law Governing Lawyers seemed to suggest that a former client has a right to access the attorney's files about the client's case. *Id*. The court did not take a definitive position on this specific issue.

In the instant case, we believe that the Court's order of March 7, 2008 was sufficient to provide the Skrzypeks with the documents they needed. That order instructed counsel to turn over all public records relating to the July 1997 search of the garage, which is the incident at the heart of the Skrzypeks' petitions. Both attorneys appear to have complied with this order, with James' attorney sending transcripts to James via Federal Express on April 17, 2008 and July 29,

2008, and Janice's attorney stating in a letter dated May 1, 2008 that he had "examined [Janice's] entire file" and "found no records that would apply to the court's order." (Government's Resp. to Defs.' Mot. for Recons. at 3, Ex. A, Ex. B.) The Skrzypeks seek to obtain their entire files with the hopes of discovering documents or notes in which their attorneys may have explained additional arguments to bring in their petition, but there is no evidence to suggest that the attorneys' files contain such documents. The arguments surrounding the search of the garage have been fully developed, and we decline to expand the Court's March 7, 2008 order based on the Skrzypeks' mere suspicion or hope that additional arguments have been developed.

###  C.   Motion to Expand the Record

On September 22, 2009, the Skrzypeks filed "Motion[s] to Expand the Record." (Dkt. 72 in 5753, Dkt. 53 in 5754.) They cite to Rule 7 of the Rules Governing Section 2255 Proceedings, and ask that the Court expand the record to include the exhibits attached to their memorandum of law and facts in support of their amended petition. To the extent that the Skrzypeks are asking the Court to consider the information contained in these exhibits when considering the amended petition, we note that we have reviewed and considered all of the documents submitted by the parties. To the extent that the Skrzypeks are asking the Court to expand the record in any official manner, no such expansion is necessary, as the amended petition is denied, for the reasons set forth above. Therefore, the motion to expand the record is denied.

## IV.   Motion to Strike

Finally, there is one other motion pending on both of the Skrzypeks' dockets that has not yet been addressed. On April 20, 2009, the Skrzypeks filed motions to strike as untimely the government's response to the Skrzypeks' motion to defer assessment payments. (Dkt. 61 in

5753, Dkt. 44 in 5754.)  These motions refer to activity that took place in the Skrzypeks'

criminal case (97 CR 516), which is not currently before this judge.

Even so, a quick review of the criminal case docket shows that the Skrzypeks misstate the

relevant deadlines that they accuse the government of missing.  The Skrzypeks field a motion to

defer assessment payments on October 2, 2008.  (Dkt. 526 in 97 CR 516.)  The government's

response was filed on April 9, 2009 (Dkt. 532 in 97 CR 516), which the Skrzypeks claim was 42

days after the deadline set by the court (Mot. to Strike at 2).  It is true that the *original* deadline

for the government's response was set as February 26, 2009 (Dkt. 530 in 97 CR 516), but that

deadline was subsequently extended to April 10, 2009 (Dkt. 531 in 97 CR 516).  Therefore, the

government's April 9 response was not 42 days late, but rather 1 day early.

Because these motions to strike relate to the criminal case, not the habeas case before this

judge, and because the motions misstate the relevant briefing schedule, these motions are denied.

## V.     Certificate of Appealability

The Skrzypeks ask that, if the Court denies their amended § 2255 motions, it should issue

a certificate of appealability, "as it is debatable amongst jurists of reason whether the

government violated the Fourth Amendment when Agent Diwik searched the Skrzypeks' garage

attic," and it is also "debatable whether, had this evidence been suppressed, there is a reasonable

probability the outcome of the trial would have been different."  (Mem. in Supp. of Am. Pet. at

18.)

28 U.S.C. § 2253(c) provides that a certificate of appealability may issue only if the

applicant has made a substantial showing of the denial of a constitutional right.  Based on the

foregoing discussion, it is clear that there was no violation of the Skrzypeks' Fourth Amendment

rights.  Furthermore, the representation of counsel was reasonable, and no prejudice resulted

from the complained of conduct. We believe there to be no issues which are debatable among jurist of reason and could possibly indicate the denial of a constitutional right. Therefore, we decline to issue a certificate of appealability.

## CONCLUSION

For the reasons set forth above, the outstanding motions on the docket of 07 C 5753, relating to James Skrzypek, are ruled on as follows:

- The original motion to vacate, set aside or correct sentence [1] is denied as moot, as an amended petition was subsequently filed.

- The motion for reconsideration of the denial of appointment of counsel [32] is denied.

- The motion to strike the government's response to the Skrzypeks' motion to defer assessment payments [61] is denied.

- The motion to order production of documents pursuant to rule 6 [64] is denied.

- The motion to compel delivery of complete client files from former appointed appellate counsel [66] is denied.

- The motion for appointment of named counsel [67] is denied.

- The amended habeas petition [69] is denied.

- The motion for order directing the United States to answer the amended § 2255 motion [71] is denied.

- The motion to expand the record [72] is denied.


Likewise, the outstanding motions on the docket of 07 C 5754, relating to Janice Skrzypek, are ruled on as follows:

- The original motion to vacate, set aside or correct sentence [1] is denied as moot, as an amended petition was subsequently filed.

- The motion for reconsideration of the denial of appointment of counsel [24] is denied.

- The motion to strike the government's response to the Skrzypeks' motion to defer assessment payments [44] is denied.

- The motion to order production of documents pursuant to rule 6 [47] is denied.

- The motion to compel delivery of complete client files from former appointed appellate counsel [49] is denied.

- The motion for appointment of named counsel [50] is denied.

- The amended habeas petition [52] is denied.

- The motion for order directing the United States to answer the amended § 2255 motion [54] is denied.

- The motion to expand the record [53] is denied.


This memorandum opinion and order addressed all pending petitions and motions, and this case is hereby terminated. This is a final and appealable order.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: April 20, 2010